# In the United States Court of Federal Claims

No. 02-704 C
(E-filed: September 29, 2006)

| | | |
|---|---|---|
| TESORO HAWAII CORPORATION | ) | Contracts - Economic |
| | ) | Price Adjustment Clauses: |
| AND | ) | Illegality; FAR § 16.203; |
| | ) | fair and reasonable prices; |
| TESORO ALASKA COMPANY, | ) | FAR §15.402; |
| | ) | Misrepresentation; |
| Plaintiffs, | ) | Mistake of Fact; Fifth |
| | ) | Amendment Takings |
| vs. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

J. Keith Burt, Mayer, Brown, Rowe & Maw, Washington D.C. for plaintiffs.

Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, United States Department of Justice, Washington D.C., for defendant. With him were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Howard M. Kaufer and Donald S. Tracy, of counsel.

## OPINION

BRUGGINK, Judge

This case returns to the court after an interlocutory appeal to the Federal Circuit. Tesoro Hawaii Corp. v. United States, 405 F.3d 1339 (Fed. Cir. 2005). Now pending is defendant's dispositive motion. Defendant moves pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") to dismiss several paragraphs of the second amended complaint for lack of jurisdiction and seeks summary judgment under RCFC 56(b) as to the rest of the complaint. In the alternative, defendant moves to dismiss the entire complaint pursuant to RCFC 12(b)(6) for failure to state a claim. Plaintiffs oppose that motion and ask for a continuance to permit discovery under RCFC 56(f). Also pending is defendant's motion to stay proceedings pending appeals

in related cases.  Plaintiffs oppose that motion.

The matter has been fully briefed and oral arguments were heard on August 3, 2006.  For the reasons stated below, we grant defendant's motion to dismiss paragraphs 45 and 46 for lack of jurisdiction and dismiss the rest of the complaint for failure to state a claim..

BACKGROUND[1]

This case involves the Defense Energy Supply Company's ("DESC") use of economic price adjustment ("EPA") clauses in a series of military jet fuel contracts between the United States, acting through the Defense Energy Supply Company ("DESC"), and plaintiffs, Tesoro Hawaii and Tesoro Alaska Corporations.[2]  Plaintiffs are wholly owned subsidiaries of Tesoro Petroleum Corporation ("Tesoro").

The 39 contracts involved in this suit were entered into and fully performed between 1982 and 1999.  The contracts were for the sale of nearly one billion dollars of several different types of military grade jet-fuel to be delivered at different locations in Hawaii and Alaska.  The contracts included DESC's standard price escalation clause 19.33 or one substantially similar to it.  The EPA clauses adjusted the base contract price upwards or downwards in relation to the movement of a reference price contained in a specified price index.

The majority of these contracts were awarded under DESC's domestic bulk-fuels program.  From 1984 to 1994, the contracts under the bulk-fuels program tied their EPA clauses to specific price indexes contained in the Petroleum Marketing Monthly ("PMM").  The PMM is a collection of price indexes for specific products and regions,[3] published monthly by the

---

1.  We draw these facts from the Second Amended Complaint, our earlier opinion, Tesoro Hawaii Corp. v. United States, 48  Fed. Cl. 65 (2003), and the Federal Circuit's opinion in the interlocutory appeal, Tesoro, 405 F.3d 1339 (2005).

2.  The Defense Energy Support Company ("DESC") was formerly known as the Defense Fuel Supply Center ("DFSC") and is a field activity of the Defense Logistics Agency ("DLA"), a component of the Department of Defense ("DOD").

3.  The regions are known as Petroleum Administration for Defense Districts ("PADD's").

Department of Energy ("DOE").  In 1995, the domestic bulk-fuel program switched indexes from the PMM to Platt's Oilgram Price Report ("Platt's), a well-known industry publication.  Nine of the contracts involved in this suit were awarded under other fuel programs and were tied to well-known price indexes.[4]  These various price index publications are referred to as market-based publications because they draw their price information from the market as a whole and are not tied to a single supplier or refiner.  See Tesoro II, 405 F.3d at 1345 (characterizing the issue as one of DESC's liability for the use of market-based EPA clauses).

In 1992, this court held that PMM-based EPA clauses were a violation of the applicable Federal Acquisitions Regulations ("FAR").  MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992) (holding that the use of the PMM violated FAR section 16.203 because it did not reflect changes in the "contractor's established prices").  Tesoro filed this suit in 2002.  We granted partial summary judgment to plaintiffs on the issue of the illegality of the PMM-based clauses and on the defense of waiver, deciding that the term "established prices" in FAR section 16.203-1 was used interchangeably by the drafters of the FAR with the term "contractor's established prices" in section 16.203-3.  Tesoro Hawaii Corp. v. United States, 48 Fed. Cl. 65 (2003) ("Tesoro I").  We subsequently certified the issues of illegality and waiver for interlocutory appeal.  The Federal Circuit took the appeal and consolidated it with an interlocutory appeal on the same issues in Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 409 (2003).  The appellate court reversed our decision regarding the PMM and FAR section 16.203, holding that the use of PMM-based clauses was not invalid because the FAR allows for the use of market-based indexes.  Tesoro II, 405 F.3d at 1348.

Procedural History

Subsequent to the Federal Circuit's opinion, plaintiffs amended their complaint.  The Second Amended Complaint contains seven counts: illegality; misrepresentation; breach of contract; implied-in-fact contract; failure of consideration and frustration of purpose; mistake; and a constitutional taking.  Defendant has moved for dismissal, or, in the alternative, for summary judgment on all counts.  Defendant filed a supplemental appendix in support

_____

4. One 1983 contract was tied to a Bureau of Labor Statistics ("BLS") publication. Contracts awarded to Tesoro in the cool barge program were tied to either the Oil Price Information Service ("OPIS") or the Lundberg Letter ("Lundberg").

of its application for summary judgment.  We have not, however, considered its contents for purposes of this opinion.

Plaintiffs have filed a response and brief in opposition along with a two volume appendix.  We have not considered plaintiffs' appendix for the purposes of this opinion.  Plaintiffs have also filed a motion and affidavit pursuant to RCFC 56(f) asking the court either to reject defendant's application for summary judgment or for a continuance to permit discovery.

DISCUSSION

## I.  Count I: EPA Clause Legality

### A.  Contractor's Established Prices

Paragraphs 41 through 43 of count I allege the illegality of the EPA clauses under the FAR.[5]  In paragraph 41, plaintiffs allege that DESC violated FAR section 16.203 by using EPA clauses based on price indexes rather than on "plaintiffs' own established fuel prices."[6]  (Second Am. Compl. ¶ 41.) (hereinafter "Compl.")

The Federal Circuit clearly rejected this argument: "a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor."  Tesoro II, 405 F.3d at 1347.  The Federal Circuit found that the definition of "established prices" in FAR section 15.804-3 included "established catalog prices" and "industry

---

5.  Paragraphs 44 through 46 concern other illegality claims not based on the EPA clauses and are discussed later in this opinion.

6.  FAR section 16.203-1, "Description," states in relevant part, "Economic price adjustments are of three general types: (1) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items." (emphasis in the original).  48 C.F.R. § 16.203-1(a)(1) (2005).

FAR section 16.203-3, "Limitations," states: "economic price adjustments shall not be used unless . . . it is necessary either to protect the contractor and the Government against fluctuations in labor or material costs or . . . in the event of changes in the contractor's established prices."  48 C.F.R. § 16.203-3 (2005).

based prices, namely 'established market prices.'"[7]  Id. (citing 48 C.F.R. §
15.804).  Because the FAR allows EPA clauses to be based on "established
market prices," id., and not just "contractor's established prices," plaintiff's
allegations in paragraph 41 fail to state a claim recognized by law.

### B.  "Per se" Versus "as Applied" Illegality

In response to Tesoro II, plaintiffs amended their complaint to allege
that, even if market-based indexes are allowed, DESC still violated FAR
section 16.203 by "basing price adjustments on indexes that were not market-
based, were not designed or intended to be used to set or adjust prices, and did
not reflect at least the fair market value of military fuel."  (Compl. ¶ 42.)
Plaintiffs attempt to distinguish Tesoro II by arguing that the Federal Circuit
only decided that the PMM-based clauses were not per se illegal.  They quote
various sections of the Tesoro II opinion to the effect that market-based
indexes are legitimate under the FAR, but contend that the court never
specifically held that the PMM is a market-based index.  (Pl.'s Op. 22-24
(citing Tesoro, 405 F.3d at 1342, 1343-44, 1348).)  Plaintiffs point to a
footnote in their brief before the Federal Circuit in which they stated that only
the issue of per se illegality was before the court.  They thus argue that it
would have been improper for the Federal Circuit to decide that the PMM was
actually a market-based index, because that is an issue of fact and not the
subject of either this court's ruling or either parties' position on appeal in
Tesoro II.

Defendant responds that the language of the Tesoro II opinion is clear
that the PMM is an authorized market-based index.  Defendant cites ten
statements within the Tesoro opinion to that effect.  Defendant also explains
why the other indexes used in the contracts also pass muster under Tesoro II,
arguing that the additional indexes are clearly drawn from market sources and
are thus market-based.

The Tesoro II opinion was the result of consolidated interlocutory
appeals from this court's earlier decision in this case, 58 Fed. Cl. 65, and
Hermes Consolidated, Inc., 58 Fed. Cl. 409.  In this case, the relevant question
certified for appeal was, "[d]id DESC establish the price of fuel in violation

---

7.  It must be noted that FAR section 15.804 no longer appears in any form in the
2005 version of the Code of Federal Regulations ("CFR").  The last year in which
any form of section 15.804 appeared was 1996.  48 C.F.R. § 15.804. (1996).  The
version cited in the Federal Circuit's opinion is the 1994 edition.

of law by employing economic price adjustment clauses indexed to the PMM?"  Tesoro II, 405 F.3d at 1342.  In Hermes, the relevant question was, "[was] DESC's promulgation of the [EPA] clauses indexed to the PMM unauthorized?"  Id.  The appeal to the Federal Circuit was thus not put in terms of per se illegality versus some other type of illegality, but rather in more general terms, namely, whether the PMM-based EPA clauses were authorized under FAR section16.203.  The court concluded that PMM-based EPA clauses are valid: "DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR . . . ."  Id. at 1348 (emphasis added).[8]

The converse of a per se illegality argument is an "as applied" illegality argument.  Compare Tesoro II, with Smith v. Erickson, 961 F.2d 1387 (8th Cir. 1992) (appellant claimed that prison's denial of unlimited free postage and stationary was illegal as applied to him because he was indigent), and National Treasury Employees Union v. Reagan, 663 F.2d 239 (D.C. Cir. 1981) (plaintiffs, who had been appointed for employment but were not yet in service, argued that an executive department hiring freeze was illegal as applied to them, because they had irrevocable appointments).  Plaintiffs' allegations in paragraph 42 are not analogous to these examples of "as applied" claims.  If the three failures of the PMM alleged in paragraph 42 were violations of regulatory requirements, it is hard to imagine how the PMM could have been applied legally in any similar contract.  No such argument has been made.  The denomination of this as an "as applied" illegality argument thus sets up a false dichotomy not anticipated by the regulations and not adopted by the Federal Circuit.

In any event, it is plain that an understanding that the PMM was a market-based index was integral to the Federal Circuit's ruling.  The court laid out what is acceptable for a price index under the FAR: "market sources independent of the manufacturer or vendor. . . ."  Tesoro II, 405 F.3d at 1347. Earlier in the opinion, the court described the PMM as a "report compiling the monthly average sales figures for specified fuels for five regions . . . ."  Id. at 1341.  After the Federal Circuit addressed "contractor's established prices" and "established market prices," it went on to address plaintiffs' arguments

---

8.  Also instructive is the court's reasoning that the waiver question  was moot. "Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions."  409 F.3d at 1348 (emphasis added).  Had the Federal Circuit intended there to be further legal tests for the PMM and other indexes, it would not have viewed the question of waiver as moot.

specifically in reference to the PMM. The court looked at plaintiffs' reliance on MAPCO. In that case, we held that the PMM-based clauses violated the FAR because "the PMM does not reflect an 'established market price.' [It] is an amalgamation of the previous month's petroleum sales data. . . . [I]t is not . . . determinative of any particular corporation's current prices." MAPCO, 27 Fed. Cl. at 410. The Federal Circuit rejected that analysis and ruled that the FAR only required that the index use "market sources" and be "market-based." Tesoro II, 405 F.3d at 1348. Implicit in its holding was that the PMM is a market-based index drawn from market sources. Plaintiffs' allegations in paragraph 42 fail to state a claim.

### C. FAR Section 15.802: Fair and Reasonable Prices

Plaintiffs also allege that the use of the PMM and other indexes was a violation of FAR section 15.802(b), which states that the contracting officer must "[p]urchase supplies and services from responsible sources at fair and reasonable prices," 48 C.F.R. § 15.802(b)(1) (1994), because the effect of these clauses was to establish prices that "were not fair and reasonable."[9] (Compl. ¶ 43.) The government counters that plaintiffs cannot maintain a claim under 15.802(b) because the section does not create a right in the contractor, but is merely a directive to the government's contracting officers. We agree with the government.

We start with the proposition that not all statutes and regulations confer a judicial remedy upon potential claimants. See American Telephone & Telegraph Co. v. United States, 307 F.3d 1374, 1377, 1379-80 (Fed. Cir. 2002) ("AT&T V"). In AT&T V, for example, Navy contracting officers failed to obtain a statutorily-required departmental certification that would have supplied the necessary authority to enter into the contract. This was a violation of both statute and regulations. The Federal Circuit nevertheless held that no remedy was afforded to contractors under the statute or the applicable regulations, because they were promulgated to protect the government and did not create a right in contractors. Id. at 1380; see also Freightliner Corp. v. Caldera, 225 F.3d 1361, 1365 (Fed. Cir. 2000); Cessna Aircraft. Co. v. Dalton, 126 F.3d 1446, 1451 (Fed. Cir. 1997); Rough Diamond Co. v. United States, 351 F.2d 636 (Ct. Cl. 1965).

We previously considered section 15.802 in a similar context in Short

---

9. FAR section 15.802 is now found at 15.402. We will refer to section 15.802 as it was at the time of these contracts.

Brothers. v. United States, 65 Fed. Cl. 695 (2005) (citing and applying AT&T V).  There we held that: "FAR provisions cited by plaintiff purport to do no more than to provide internal government direction. . . .  FAR § 15.802 . . . only requires that the contracting officer 'purchase supplies and services from responsible sources at fair and reasonable prices.'  It does not afford a judicial remedy."  Id. at 764-65 (internal citations omitted).  We agree with the holding in Short Brothers.[10]

The preliminary section, 15.800, "Scope of subpart," states, "[t]his subpart prescribes the cost and price negotiation policies and procedures . . . ."  48 CFR § 15.800 (1995).[11]  It is not a prohibition of any government conduct, but rather a guide for the contracting officer.  It therefore does not afford any right of recovery to contractors.  See AT&T V, 307 F.3d at 1379-80 (regulations provided guidance to the contracting officer and cautioned against certain contract types, however, "a caution . . . is not a prohibition").  Section 15.802(b) does not afford a judicial remedy to plaintiffs.  Paragraph 43 fails to state a claim.

**D.  The "Other Indexes" Alleged to be Illegal**

In addition to the PMM, plaintiffs allege that they were harmed by the use of other indexes in nine of the contracts at issue.  They make these allegations by employing the phrase "PMM and other indexes" throughout the complaint.  Plaintiffs, however, offer no additional explanation in their complaint, briefing, or at oral argument as to why the other indexes were illegal under the FAR.  Plaintiffs include an entire preliminary section in the

---

10.  Plaintiffs insist that the plain meaning of the regulation, the dictionary definition of "fair;" the Armed Services Pricing Manual ("ASPM"); the Defense Procurement and Acquisition Policy, Contracting Pricing Reference Guide; and even professors Nash and Cibinic's eSeries Government Contracts Reference Book all establish that prices are to be fair and reasonable to both sides of the contract.  While the cited authorities may be wholly correct, none stand for the proposition that FAR section 15.802 (now at § 15.402) gives a right of enforcement to contractors.  In fact, professors Nash and Cibinic support the holding in Short Brothers:  "The primary focus of these requirements is to ensure that the Government does not pay unreasonably high prices."  Formation of Government Contracts 1279 (3rd Ed. 1998) (emphasis in the original).  This makes sense given that these regulations were promulgated in order to ensure that the government pay the lowest reasonable price. Id.

11.  Section 15.800 now appears at 48 CFR § 15.400 (2005).

complaint entitled "PMM." (Compl. ¶¶ 11-27.) There are no similar sections included for any of the four additional indexes. Paragraph 27 simply states, "[o]n information and belief, DESC also knew that some of the other indexes it used to set or adjust prices were not appropriate for these purposes." (Compl. ¶ 27.)

During oral argument, plaintiffs' counsel pointed to some of the other indexes used in these contracts as ones which should have been considered as alternatives to the PMM. The court asked plaintiffs' counsel, "What should have been used instead of the PMM?" (Tr. at 18, Aug. 3, 2006.) The answer: "There are a number of different potential markers that you could use there, Your Honor. One of them might be Platts, one of them might be other indices that are published." (Tr. at 19.) Later in the same line of questioning, plaintiffs' counsel stated, "Could there have been a Platts number that worked for some of those fuels? Very possibly. Could there have been a Lundberg? Perhaps . . . ." (Tr. at 23 (referring to the "Lundberg Letter," a commercial petroleum market index).) Rather than providing grounds for the unique illegality of other indexes, plaintiffs actually suggest that some of the "other indexes" used in these contracts might have been better alternatives to the PMM.

We believe that no meaningful allegations or arguments have been made concerning the other indexes to lead to a different outcome under Tesoro II: "'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." 405 F.3d at 1347. It is clear that these indexes pass this test. Therefore, plaintiffs' allegations fail to state a claim.

## II.  Count I: Other Illegality Claims

Plaintiffs also challenge the legality of these contracts in two other respects. First, paragraphs 44 and 45 challenge DESC's small business set-aside program. Paragraph 44 alleges that certain bid solicitation procedures employed by DESC were "illegal auction techniques" in violation of the Office of Federal Procurement Policy Act ("OFPPA") and its implementing regulations. Paragraph 45 alleges that DESC "improperly solicited and awarded portions of the procurement set aside for small businesses together with those for large businesses" in violation of the Department of Defense FAR Supplement ("DFARS") part 219. (Compl. ¶ 45.) Finally, plaintiffs allege in paragraph 46 that DESC improperly awarded contracts under a minority bidding preference in violation of the Fifth Amendment to the United

States Constitution.  The government challenges the allegations in paragraph 45 and 46 under RCFC 12(b)(1) as claims over which this court does not have jurisdiction.  It challenges paragraph 44 as failing to state a claim, or, in the alternative seeks judgment under RCFC 56(b).

## A.  Minority Bidding Preference

We will consider plaintiffs' allegations in paragraph 46 first because that is the order in which the issues were briefed and it facilitates the analysis of paragraph 45.  In paragraph 46, plaintiffs allege that, "DESC knowingly awarded and administered each of Plaintiff's contracts in violation, *inter alia*, of the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest."  (Compl. ¶ 46.)  In sum, plaintiffs are alleging that they were forced to bid lower than market value to win the contracts in order to compensate for the minority bidding preference.

Defendant does not attempt to justify the minority bidding preference on fifth amendment grounds, but rather points to the fact that the alleged violation, even if presumed to be in contravention of the fifth amendment, has no connection to the contracts at issue.  Defendant argues, therefore, that it is too late for this court to exercise jurisdiction over these allegations.  The proper time for challenging these preferences was in a pre-award bid protest. We agree with defendant.

The due process clause of the fifth amendment does not create a substantive right of recovery under the Tucker Act, 28 U.S.C. § 1491.  Hamlet v. United States, 63 F.3d 1097, 1102 (Fed. Cir. 1995); LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995); Carruth v. United States, 627 F.2d 1068, 1081 (Ct. Cl. 1980).  Plaintiffs point to no other statute that mandates monetary compensation for a violation of the fifth amendment.  Thus, under the Tucker Act, a contract must underlie the claim. Trauma Services Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (holding that "either an express or implied-in-fact contract" must underlie a claim).

In their brief in opposition, plaintiffs rely on four cases to argue the

existence of jurisdiction over this type of claim.[12]  We have considered them carefully and concluded that none of them support jurisdiction here.

The first case on is <u>Gould, Inc. v. United States</u>, 67 F.3d 925 (Fed. Cir. 1995).  Plaintiffs cite it for the proposition that "allegations that [sic] express contract was entered into in violation of a statute 'is sufficient . . . to confer jurisdiction in the Court of Federal Claims.'" (Pl.'s Op. to Def.'s Mot. 54 (quoting <u>id.</u> at 930).)  In <u>Gould</u>, the plaintiff sued under the theories that: 1) the contract was a violation of 10 U.S.C. § 2306(h)(1)(D) (1982);[13] 2) the Navy improperly withheld information from it and other bidders; and 3) there was mutual mistake of fact.  <u>Gould</u>, 67 F.3d at 928.  The Federal Circuit held that dismissal for lack of jurisdiction was inappropriate because the plaintiff alleged both implied-in-fact and express contract claims.  <u>Gould</u>, 67 F.3d at 929-30.

In contrast, Tesoro's claim is based on a fifth amendment challenge to a bidding preference.  As held by this court in a similar case, these allegations find fault with the bidding process and not the contract itself.  <u>La Gloria Oil and Gas Co. v. United States</u>, No. 02-465C, 2006 U.S. Claims LEXIS 255, at *65 (August 28, 2006).  The proper avenue for a fifth amendment challenge to the bidding process is a bid-protest action.  <u>See</u> <u>Rothe Dev. Corp. v. Dep't of Defense</u>, 262 F.3d 1306 (Fed. Cir. 2001).  Unlike in <u>Gould</u>, consequently, plaintiffs' contracts do not underlie their fifth amendment due process claim.

Plaintiffs also argue that their case is similar to that asserted in <u>National Leased Housing Ass'n v. United States</u>, 24 Cl. Ct. 647 (1991).  In that case, plaintiffs brought a claim in connection with housing assistance program contracts.  They asserted that the way in which their reimbursement rates were adjusted violated the due process and equal protection clauses.  <u>Id.</u> at 649, 655.  The court held that there was jurisdiction over such claims only to the extent that the alleged violations constituted a breach of contractual provisions.  <u>Id.</u>

---

12.  <u>Rothe Dev. Corp. v. United States Dep't of Defense</u>, 262 F.3d 1306 (Fed. Cir. 2001); <u>Gould, Inc. v. United States</u>, 67 F.3d 925 (Fed. Cir. 1995); <u>LaBarge Prods., Inc. v. United States</u>, 45 F.3d 1547 (Fed. Cir. 1995); <u>Nat'l Leased Hous. Ass'n. v. United States</u>, 24 Cl. Ct. 647 (1991).

13.  The alleged violation in <u>Gould</u> was a lack of the stable design required by the statute in order for agencies to enter into multi-year contracts of the type at issue in that case.  67 F.3d at 928.

at 650. Plaintiffs argued that the proper interpretation of the contracts included an obligation to comply with the fifth amendment. Id. at 652. The court did not decide if any such an obligation arose in the contract, however, because it found that there was no fifth amendment violation. Id. It therefore did not reach the jurisdictional issue. Id.

Plaintiffs further suggest that Rothe Development Corp. v. Department of Defense, 262 F.3d 1306 (Fed. Cir. 2001), and LeBarge Products, Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1995), establish jurisdiction in this court through an "implied obligation to treat a bid honestly and fairly." (Pl.'s Op. 55.) Rothe was a fifth amendment equal protection challenge to a minority preference found in the National Defense Authorization Act of 1987, 10 U.S.C. § 2323 (1994), and was brought as a bid protest under the Tucker Act. The Federal Circuit held that it had jurisdiction because "an unsuccessful bidder can recover its bid preparation costs from the government on the theory that failure to evaluate a 'bid honestly and fairly' breaches an implied-in-fact contract of fair dealing." Id. at 1316 (citing Coflexip & Servs., Inc. v. United States, 961 F.2d 951, 952-53 (Fed. Cir. 1992)). No comparable bid protest claim was made here.

In LeBarge, plaintiff brought a post-award claim for reformation on two independent grounds: existence of an implied obligation of fair dealing and the use of illegal auction techniques. 46 F.3d at 1552. The court held that there was jurisdiction because plaintiff's claims related to the contract and were not based solely on an implied obligation  Id. at 1551-52 (there is no Contract Dispute Act jurisdiction if there is no express contract). Additionally, the court in LeBarge found that the FAR's prohibition of auction techniques in section 15.610 was implemented for the benefit of the contractor and thus created a right of recovery. Id. at 1552. The court in LeBarge also emphasized that the "operative facts" related to the contract claim. Id. at 1553. Finally, in LeBarge, plaintiff did not know of the illegality until after its final bid, thus making it impossible to have filed a pre-award bid protest. Id. at 1549-50.

Contrary to Tesoro's argument, the holding in LeBarge does not support post-award jurisdiction on the singular basis of an implied obligation to treat bids honestly and fairly. Rather, LeBarge's claim was based on more than just an implied obligation. Id. at 1551-52 (holding that LeBarge's claims related to the express contract). In the present case, the operative facts do not relate to the contract because Tesoro chose to bid lower and thus avoid the application of the minority preference. (Tr. at 47 (stating "you have to bid ten

percent lower than the other guy to get the contract. . . . You can't be competitive unless you lower your price").) <u>See</u> <u>La Gloria</u>, 2006 U.S. Claims LEXIS at *63.  Also in contrast to <u>LeBarge</u>, there is no statute or regulation that creates a right of recovery.  <u>See</u> <u>LeBlanc</u>, 50 F.3d at 1028 (the fifth amendment provides no substantive right of recovery).  Also relevant here is the fact that, unlike LeBarge, Tesoro knew of the alleged illegal activity and chose to forgo a pre-award bid protest.  It adjusted its bid down to avoid the minority preference and win the contract.  <u>See</u> <u>ConocoPhillips v. United States</u>, No. 02-1367C, 2006 U.S. Claims LEXIS 268, at *33-34 (Sept. 12, 2006) ("plaintiffs cannot on the one hand remain silent in the face  of what they now contend was a facially invalid solicitation and admittedly reduce their prices to remain competitive . . . and then, on the other hand, seek many years after the fact to challenge the prices they themselves had set").

Nor does the <u>Rothe</u> case support plaintiffs' allegations.  The plaintiff in <u>Rothe</u> was a disappointed bidder who filed a bid protest, unlike the plaintiffs here, who were awarded the contracts.[14]  No specific term in the contracts between Tesoro and DESC was a violation of the fifth amendment.  <u>See</u> <u>La Gloria</u>, 2006 U.S. Claims LEXIS at *65; <u>cf</u>. <u>Nat'l Leased Housing</u>, 24 Cl. Ct. at 650 (holding that alleged constitutional violations must constitute a breach of contract in order to support jurisdiction).  Rather, plaintiffs allege that they were forced to bid 10 percent lower in order to circumvent the application of the preference and win the award of the contract.  This does not create a claim arising under a contract, but was rather an election on the part of Tesoro to avoid the application of the preference. <u>See</u> <u>ConocoPhillips</u>, 2006 U.S. Claims LEXIS at *33-34.   Therefore, we have no jurisdiction over plaintiffs' allegations in paragraph 46.

## B.  Small Business Set-Aside

### 1.  Illegal Auction Techniques

Plaintiffs allege that DESC's small business set-aside program constitutes a prohibited auction in that it gives small business offerors a price they must match in order to be awarded contracts under the set-aside.  Plaintiffs argue that this "match price" method is a violation of FAR section 15.610 because it indicates to an offeror "a cost or price it must meet to obtain

---

14.  Presumably, had the contracts not been awarded to plaintiffs, they would have challenged the award through a bid protest.

further consideration" and because it advises "an offeror of its price standing relative to another offeror."[15] (Pl.'s Op. 58-59 (citing 48 C.F.R. § 15.610).) Plaintiffs also allege that DESC awarded contracts to bidders that agreed to match other bidders' prices in violation of the OFPPA, 41 U.S.C. § 423, by illegally disclosing other bidders' bid or pricing information.[16]

Defendant does not challenge these factual allegations, but rather argues that the program procedures are not auctions and are not prohibited by the OFPPA or the FAR.[17]   Defendant argues that its match price method is not an auction because it does not cause "direct bidding of price between two

---

15.  FAR § 15.610 (1984) predated the enactment of the OFPPA, and was first tied to it in 1991.  48 C.F.R. § 15.610 (1991).  Tesoro challenges the contracts entered into prior to 1984 under FAR § 15.610 alone.  (Pl.s Op. 58 n.66).  FAR § 15.610 was repealed in 1997.

16.  The provisions of the OFPPA at issue here were enacted in 1988, Pub. L. No. 100-679, § 6, 102 Stat. 4055, and later amended in 1996, Pub. L. No. 104-106, § 4304, 110 Stat. 659.

17.  The OFPPA states in relevant part, "A person described in paragraph (2) shall not, other than as provided by law, knowingly disclose contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(a)(1).
     FAR section 15.610(e) states in relevant part:

     (e) The following may constitute prohibited conduct under section 27 of the [OFPPA] . . .
     (1) Technical transfusion (i.e., Government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal; or
     (2) Auction techniques, such as –
     (i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;
     (ii) Advising an offeror of its price standing relative to another offeror. . . .
     (iii) Otherwise furnishing information about other offerors' prices.

FAR § 15.610(e).

competing offerors." (Def.'s Mot. 34 (citing <u>DGS Contract Serv., Inc. v. United States</u>, 43 Fed. Cl. 227, 239 (1999).) It argues that the set-aside simply gives small business offerors an opportunity to match "the price the Government otherwise would pay, adjusted for the transportation cost the Government would incur." (Def.'s R. to Pl.'s Op. 25.) Defendant contends that this is authorized by the FAR and was contemplated by the original version of the OFPPA, which stated that bid information could be released to "a person authorized by the head of such agency or the contracting officer." Pub. L. No. 100-679, § 6, 102 Stat. 4055, 4063 (1988).

This court has defined the term "auction" to mean "direct bidding of price between two competing offerors." <u>DGS Contract Serv.</u>, 43 Fed. Cl. at 239; <u>M.W. Kellog Co. v. United States</u>, 10 Cl. Ct. 17, 24 (1986). This definition is directly relevant here. In <u>DGS Contract Serv.</u>, the court addressed both the OFPPA and FAR section 15.306 (previously 15.610). <u>See</u> 48 C.F.R. § 15.306 (1998). In <u>M.W. Kellog Co.</u>, the court considered the disappointed bidder's suit under section 15.610. In both of those cases, the plaintiffs were disappointed bidders. The plaintiffs directly bid against other bidders in the same procurement program, which continued through multiple rounds of bid solicitations. The courts in those cases held that the procurement processes were not auctions despite the multiple rounds of solicitations. <u>DGS Contract Serv.</u>, 43 Fed Cl. at 242 (holding that the multiple bid solicitations and disclosure of limited price range information was not prohibited under the OFPPA or the relevant regulations); <u>M. W. Kellog Co.</u>, 10 Cl. Ct. at 24 (holding that the disclosure of the price goal that the government would pay between the rounds of proposals was not an auction prohibited by FAR section 15.610).

Here, plaintiffs have failed to allege facts sufficient to state a claim for an illegal auction prohibited by the OFPPA or the FAR. There was no back and forth bidding between competing offerors that would indicate direct bidding between them. A good example of direct bidding is found in <u>LeBarge</u>, 46 F.3d 1547. There, the government solicited bid proposals for the fitting of couplings that would connect aluminum piping for various installation work. <u>Id</u>. at 1549. LeBarge's bid proposal was the lowest, but the Army was concerned that LeBarge was not the same company that would be laying the pipes. The next lowest bidder, Victualic, was informed that LeBarge was the low bidder and the Army then requested best and final offers from both companies. LeBarge informed the contracting officer that it would not lose the contract and would rebid at a lower price. The fact that LeBarge intended to

bid in the "low 30's" was mysteriously[18] disclosed to Victualic before the second round of bid proposals. LeBarge still offered the lowest bid and Victaulic filed a pre-award bid protest with the General Accounting Office, where LeBarge learned of the disclosure for the first time. LeBarge was eventually awarded the contract and filed a claim for contract reformation on the basis that the illegal disclosure of bid information caused it to bid too low. The Federal Circuit ultimately held that, although the disclosure of bid information was a violation of the FAR, LeBarge was not harmed by the the disclosure because it did not know of the disclosures until after its bid proposals. Id. at 1556.

In the present case, however, there were not multiple rounds of bid solicitations. DESC simply "awarded contracts to bidders that agreed to match other bidder's prices." (Compl. ¶ 44). There is no real dispute over what the set-aside program involves. Plaintiffs cite the government's brief for a description of the program: "DESC informs small businesses of the price that the Government would otherwise pay for a particular fuel product (as the result of a pending fuel solicitation)." (Pl.'s Op. 58 (citing Def.'s Mot. at 33).) The price is then adjusted for transportation costs and small businesses can choose whether to match this price. This is not in any sense direct bidding of one offeror against another.

The second reason DESC's set-aside is not an auction is that larger businesses are not in direct competition with small businesses. Instead, a set-aside program effectively takes a portion of the fuel needed and places it in a separate procurement program to be awarded to small businesses. This is not the sort of situation contemplated by either the OFPPA or the FAR. Indeed, quite the opposite. FAR section 19.502 mandates set-aside programs whenever certain conditions in section 19.502-1 and 2 are met. 48 C.F.R. § 19.502-1(a)(1-2). Section 15.508 requires the contracting officer to use the FAR-mandated clause provided in section 52.219-7 in all solicitations and contracts awarded to small businesses under the set-aside. 48 C.F.R. § 15.508. Section 52.219-7, "Notice of Partial Small Business Set-Aside," provides the mechanism for awarding the set-aside portion: "The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion." 48 C.F.R. § 52.219-7(b)(3). The government is actually required to use a "match-price system." Under plaintiffs' reasoning, every small business

---

18.   There was no evidence in the record as to who actually disclosed the information.

set-aside under section 15.508 would necessarily constitute a prohibited auction, because section 52.219-7 requires that the government award the set-aside contracts "at the highest price . . . for the non-set-aside portion"-- a "match-price" procedure. Id. One part of the FAR should not be read to prohibit what another part expressly mandates.

The only difference between DESC's program and that required by the FAR is that DESC awards the non-set-aside portion before it awards the set-aside. This minor difference, however, does not change our holding. DESC's small business set-aside is not an auction because there is no "direct bidding between competing offerors." See DGS Contract Serv., 43 Fed. Cl. at 239.

2.   Awarding Portions of the Set-Aside Together with the Normal Procurement

Plaintiffs also challenge DESC's small business set-aside on the grounds that it violates DFARS part 219 and the relevant FAR section (52.219-7). FAR section 52.219-7 instructs contracting officers to evaluate offers on the non-set-aside portion and to  make an award on this portion before offering the adjusted matching price under the set-aside program. 48 C.F.R. § 52.219-7. In contrast, DESC does not first award the contracts for the non-set-aside portion.  It solicits bids on the non-set-aside portion first, but then selects the lowest price and uses it to set the price for the set-aside. Any portion not awarded ("set-aside failure") is put back into the non-set-aside procurement totals and the larger contracts are then awarded at the original non-set-aside bid price.

Once again, defendant does not challenge the factual allegations in paragraph 45, but instead argues that its set-aside program is substantially similar to that of FAR section 52.219-7 and that it has authorized deviations that permit it to use this slightly different procedure.  Defendant also argues that Tesoro has not alleged that it was harmed in a concrete way as contemplated by the FAR.  Finally, defendant challenges these as allegations over which this court does not have jurisdiction because they amount to a facial attack on DESC's small business program and do not constitute a contract dispute.

We need not reach the merits of plaintiffs' argument, or the defense of an authorized deviation.  We find there is no jurisdiction over plaintiffs' allegations in paragraph 45.  The proper avenue in this court for Tesoro to challenge the small business program would have been a pre-award bid

protest. <u>La Gloria</u>, 2006 U.S. Claims LEXIS at *71-72.  As the successful bidders, plaintiffs cannot challenge the award to themselves as illegal.  <u>Cf</u>. <u>Am. Fed'n of Gov't Employees v. United States</u>, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("Congress intended to extend the jurisdiction of the Court of Federal Claims to include post-award bid protest cases brought under the APA by <u>disappointed bidders</u> . . . .") (emphasis added).  Nor have plaintiffs pointed to any specific contractual term or obligation which was allegedly illegal.

Absent any contractual or bid-protest basis for these allegations, they amount to a facial attack on the set-aside program.  We lack jurisdiction over such claims.  We, therefore, do not reach DESC's other arguments in respect to the legality of its deviations.

## III.  Count II: Misrepresentation

In count II, plaintiffs allege that the PMM and other indexes were defective in five respects.  Plaintiffs also allege that DESC knew and then either misrepresented or failed to disclose these defects to plaintiffs.  The alleged defects are: 1) DESC's violation of law and regulation in the award and administration of the contracts; 2) DESC's basing the EPA clauses on indexes that were not adequate to accomplish their stated purpose of protecting against market fluctuations and ensuring the payment of at least fair market value; 3) DESC's use of of indexes that were not "designed or intended to be used to set or adjust prices and did not reflect at least fair market value" or fair and reasonable prices; 4) DESC's knowledge that the contracts did not provide for the payment of fair market value; and 5) DESC worked with DOE to determine how the PMM would be published and to insure that DESC's needs were satisfied as "one of the primary users of the PMM."  (Compl. ¶¶ 51-60.) Plaintiffs cite several cases for the proposition that price is always an essential and material element to any contract.  <u>Roseburg Lumber Co. v. Madigan</u>, 978 F.2d 660, 666 (Fed. Cir. 1992); <u>Interstate Plywood Sales Co. v. Interstate Container Corp.</u>, 331 F.2d 449, 452 (9th Cir. 1964).  Plaintiffs allege that they relied on these material and or fraudulent misrepresentations as inducements to enter the contracts.

Defendant counters by arguing that it had no duty to disclose the alleged information and that none of it was actually material to the bargain.  It states that the terms of the contract were for the purchase and delivery of fuel to specified locations for prices set by a specific formula.  It argues that plaintiffs have failed to state a claim because they have not alleged that any part of the contracts was ambiguous, or that DESC failed to honor the price, or that the

clause failed to operate as the contract described.

A claimant may prevail on a claim for misrepresentation when it can show that "the Government made an erroneous representation of material fact that the contractor honestly and reasonably relied on to the contractor's detriment," T. Brown. Constructors, Inc. v. Sec'y of Transp., 132 F.3d 724, 729 (Fed. Cir. 1997), or when the government fails to disclose information that it has a duty to disclose. Massman Contracting v. United States, 23 Cl. Ct. 24, 32 (1991). The government has a duty to disclose when the contractor: 1) undertook to perform without knowledge of a fact that affects performance, costs, or direction; 2) the government was aware of the lack of knowledge and the fact that the contractor had no reason to obtain it; 3) any contract specification supplied by the government misled the contractor and did not put it on notice to inquire; and 4) the government failed to provide the relevant information. AT&T Commc'n, Inc. v. Perry, 296 F.3d 1307, 1312 (Fed. Cir. 2002). Stated another way: "Where the government possesses special knowledge not shared by the contractor, which is vital to the performance of the contract, the government has an affirmative duty to disclose such knowledge . . . ." Massman Contracting, 23 Cl. Ct. at 31. There is, however, no duty to disclose if the information is reasonably available. Id. at 32 (citing Utility Contractors, Inc. v. United States, 8 Cl. Ct. 42, 45 (1985)).

Plaintiffs have failed to allege a valid claim of affirmative misrepresentation. As a preliminary matter, plaintiffs' allegations concerning DESC's representations that it would follow the law and regulations in its award and administration of the contracts fail to state a claim as a matter of law. We have already held that the EPA clauses were not illegal and thus DESC cannot have misrepresented that it would it follow the law.

Nor have plaintiffs alleged any affirmative statements upon which Tesoro could reasonably have relied. The allegations all state simply that DESC "misrepresented and otherwise failed to disclose . . . ." (Compl. ¶¶ 56-60.) None of the allegations point to any specific written or oral statements by defendant upon which plaintiffs could have relied.[19] See La Gloria, 2006 U.S.

---

19. A DLA memorandum of January 5, 1993, referred to in the complaint, (¶ 10), arguably contains relevant language (EPA clauses were intended to "ensure [] that the contract price will be awarded and remain at the market price . . . which is fair and reasonable"), but this memorandum is an internal government document, written ten years after the first of the contracts at issue. (continued . . .)

19

Claims LEXIS at *80-81 (plaintiff failed to identify any particular document or oral representation that the prices defendant paid on the contract would reflect at least fair market value).

None of the alleged statements by defendant rose to the level of a warranty guaranteeing that Tesoro would receive fair market value or that the indexes were anything other than what they purported to be. Compare (Compl. ¶¶ 51-55), with T.F. Scholes, Inc. v. United States, 174 Ct. Cl. 1215, 1225 (1966) (holding that a contractor had the right to rely on affirmative representations by the government as to the subsurface conditions at the construction sites and that such representations amounted to a warranty).

Paragraph 14 of the complaint is revealing: "In basing price adjustments on PMM, DESC represented and warranted that PMM was adequate to accomplish its purposes of protecting against market fluctuations and ensuring that the prices DESC paid for military fuel reflected at least fair market value." (Compl. ¶ 14.) Tesoro effectively is claiming that the use of the PMM and, by inference, other indexes, was a guarantee that it would receive fair market value. Plaintiffs, however, have not provided this court, in their complaint, briefing, or at oral argument, with an actual measure of what fair market value was at the time of these contracts. At oral argument the court asked: "But you haven't given me anything that is 'fair market value.'" Plaintiffs' counsel replied: "It will be a factual issue." (Tr. at 58-59.) If fair market value is not readily ascertainable, it can hardly constitute an affirmative misrepresentation of fact. At best, such statements would merely be aspirational.

---

(. . . continued)
There are two other internal documents cited in the background allegations concerning the PMM: a January 1986 DESC assessment of the movements of the PMM compared to other market indexes, (Compl. ¶ 18), and a March 1989 memorandum from DESC's Office of Market Research and Analysis, which states that the DOE "will work with us to see that our needs are satisfied as we are one the primary users of the PMM." (Compl. ¶ 12.) As internal statements, these documents cannot serve as a basis for the argument that DESC "represented and warranted," (Compl. ¶ 14), to Tesoro that the indexes used would ensure at least fair market value. See ConocoPhillips, 2006 U.S. Claims LEXIS at *24 ("noticably absent . . . is any allegation that the contracting officer actually made representations . . . directly to plaintiffs"); see also La Gloria, 2006 U.S. Claims LEXIS at *81-82.

The use of a price escalator in a long term contract is an attempt by both parties to protect themselves from the risks inherent in such contracts. These clauses are an educated guess at how to best measure the future movements of the market. Any alleged statements regarding the PMM and other indexes must be viewed in this context. Cf. Glopak Corp. v. United States, 12 Cl. Ct. 96, 103 (1987) (holding that an alleged statement by a government representative that the EPA clause could not work to plaintiff's detriment was not a misrepresentation because it could not have been reasonably relied upon: "the statement in question cannot be read, in the context of the parties' negotiations, as more than a general commentary on the operation of the EPA clause"), aff'd, 851 F.2d 334 (Fed. Cir. 1988). A misrepresentation must be of an affirmative fact, knowable and ascertainable at the time of the alleged representation, and not a guess as to some future event. Fed Group, Inc. v. United States, 67 Fed. Cl. 87, 102 (2005); Restatement (Second) of Contracts, § 159 cmt. c (1981). Statements regarding the ability of market indexes to track the market or ensure the payment of fair market value concern future events and provide no basis for a claim of misrepresentation.

Plaintiffs also have failed to allege a valid claim for failure to disclose vital information. The superior knowledge doctrine normally arises when the undisclosed information is vital to the performance of the contract. See, e.g., Helene Curtis Indus., Inc. v. United States, 312 F.2d 774, 778, (Ct. Cl. 1963) (government had a duty to disclose that a chemical compound would require grinding in order to meet the specifications when the specifications themselves would lead one reasonably to infer that simple mixing was all that was required); Massman Contracting, 23 Cl. Ct. at 32 (the government had no duty to disclose that water flow had been higher than normal in recent years because that information was reasonably available). The allegations made by plaintiffs here materially differ from those that the law encompasses. The alleged failures to disclose in this case are not "vital to the performance of the contract." Id. at 31. The contracts at issue called for the purchase and delivery of fuel with a price set by a specific formula. None of the alleged failures to disclose affected Tesoro's ability to deliver the fuel or DESC's ability to pay for it. All 39 contracts at issue were fully performed. Ultimately, there is no allegation that the pricing mechanism did not perform as described in the contract. See La Gloria, 2006 U.S. Claims LEXIS at *83-85 ("The plain language of the contract describes how the PMM works").

The allegations of misrepresentation also fail to state a claim because the nature of the PMM and the other indexes used was a fact readily available to plaintiffs. Id. at *82, 84. Tesoro is an experienced oil company. These

contracts involved nearly one billion dollars in fuel.  (Compl. ¶ 7.)  Tesoro certainly had knowledge of or reason to inquire about the nature of these indexes if it did not already know.  See GAF Corp, 932 F.2d at 949 (government has a duty to disclose only if it was aware that "the contractor had no knowledge of and had no reason to obtain such information . . . .").  Both the PMM and the commercial indexes were readily available to plaintiffs. Tesoro was either aware of the way in which the indexes operated or was at least on notice to inquire.  See La Gloria, 2006 U.S. Claims LEXIS at *82-83.

Plaintiffs also allege a misrepresentation in failing to disclose DESC's role in the publication of the PMM.  Plaintiffs do not allege any additional facts, besides an apparent quotation from a DESC official to the effect that the DOE would ensure that DESC's needs were satisfied in the publishing of the PMM.  (Compl. ¶ 55.)  Plaintiffs have not alleged how this misled them in any way.  Also absent is any allegation that DESC's involvement actually affected the prices reported.  The allegations in paragraph 55 are a bald assertion of general wrongdoing and do not provide a basis for a claim of misrepresentation.  Plaintiffs' allegations in count II fail to state a claim.

## IV.  Count III: Breach of Contract

In count III, plaintiffs contend that the following were material conditions upon which they reasonably relied in entering the contracts: 1) DESC's compliance with law and regulation in awarding and administering the contracts; 2) DESC's basing the EPA clauses on indexes that were adequate to accomplish the stated purposes  of protection from market fluctuations and to ensure that DESC paid at least fair market value for the fuel; 3) DESC's use of indexes in its EPA clauses that were designed or intended to be used to set or adjust prices and which reflected at least fair market value of fuel; 4) DESC's payment of at least fair market and reasonable prices; and 5) DESC's good faith in negotiating and administering the contracts. (Compl. ¶¶ 65-69).  Paragraphs 70 through 74 allege breaches of all of these conditions.  While none of these allegations are grounded in any particular contract provision, plaintiffs argue that these conditions are drawn from the purpose of the EPA clauses.  Plaintiffs also cite Spearin v. United States, 248 U.S. 132 (1918), for the proposition that "DESC warranted that the indexes it picked to set prices would be adequate to accomplish the purpose for which they were used - namely to reflect changes in economic conditions during the term of the contracts."  (Pl.'s Op. 39 (citing id. at 136.)

22

Defendant counters that the plain language of the contract provides no grounds for such conditions.  It argues that the contract is unambiguous and that there is no basis for reformation or any other remedy when the express conditions of a contract have not been breached.

We review a breach of contract at its starting point, the language of the contract itself.  M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004).  While the contract should be construed to "effectuate its spirit and purpose giving reasonable meaning to all parts of the contract," id., the "plain and unambiguous meaning of a written agreement controls."  Hercules, Inc. v. United States, 292 F.3d 1378, 1381 (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991)).

Tesoro's allegations of breach of contract fail to state a claim because it  has not alleged any breach of an express contract provision.   The unambiguous language of the agreement will not be defeated by an alleged "spirit of the document" that would purport to add new contractual obligations, such as ensuring the payment of at least fair market value.  Plaintiffs' claim that DESC acted in contravention of contractual obligations is insufficient without citation to  specific contract language.  Plaintiffs' citation to the title of the EPA clause, "Economic Price Adjustment - Published Market Price," adds no substance.  See La Gloria, 2006 U.S. Claims LEXIS at *91.  The title merely suggests that a market-based index will be used.  Plaintiffs have not alleged that DESC actually failed to follow the formula in setting the price.

Plaintiffs' citation to Barrett Refining Corp. v. United States, 242 F.3d 1055 (Fed. Cir. 2001), and Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988), does not change our analysis.  In Barrett, this court found an EPA clause illegal and we allowed recovery on the basis of an implied agreement to pay fair market value.  45 Fed. Cl. 166, 170 (1999).  That holding was upheld on appeal.  242 F.3d at 1060.  In this case, the price term cannot be assumed to be illegal and thus Barrett does not apply.

In Beta Systems, similar to Barrett, the EPA clause at issue was found to be a violation of the applicable Defense Acquisition Regulations ("DAR"). 838 F.2d at 1185-86.  Subsequent to Beta Systems, the Federal Circuit further clarified its holding by rejecting a similar argument to Tesoro's in Glopak, 851 F.2d at 339.  The issue was not, as Tesoro argues here and the plaintiff in Glopak argued, whether the index properly tracked the price of materials.  Id. The court held that Glopak improperly stated the holding in Beta Systems: "The issue before the court with respect to the [EPA] clause there involved

was whether the particular . . . index used to determine price adjustments under the contract complied with the [DAR] . . . ." Id.

In the present case, the holding in Tesoro II established that there was no illegality in the use of market-based EPA clauses. 405 F.3d at 1348. The price clause is therefore not illegal and the language of the contract controls.

Plaintiffs' allegations, in any event, amount to an attempt to import new terms into the contract after it has been fully performed. See Thomas Creek Lumber & Log Co. v. United States, 32 Fed. Cl. 787, 792 (1995). Thomas Creek Lumber involved a contract for the sale of timber. Plaintiff claimed that the Bureau of Land Management ("BLM") had breached the contract by not suspending harvesting when it discovered the presence of an endangered species. Id. at 791. Plaintiff argued that this contractual obligation was incorporated through a BLM policy memorandum. Id. This court held that the internal BLM memorandum was not part of the contract and provided no basis for a breach of contract claim. Id. at 792. Similarly, in the present case, plaintiffs would have us derive contractual obligations from sources outside of the contract, such as internal DESC memoranda. We decline to do so. See ConocoPhillips, 2006 U.S. Claims LEXIS at *21 ("We are unable to find . . . any breach of contract based on a failure to pay fair market value when the government both clearly stated and complied with the contracts' actual pricing terms").

We are also not persuaded by plaintiffs' reliance on Spearin. That case stands for the proposition that when the government requires the contractor to build to certain specifications, it impliedly warrants the accuracy of those specifications. 248 U.S. at 137. There, the government contracted to have a sewer built to exact measurements. The contractor built to the specifications, but the sewer was inadequate and the resulting flooding interfered with the rest of construction. Id. at 134. The government was held liable because it impliedly warranted that its specifications were sufficient. Id. at 137. In the present case, nothing in the EPA clause failed to operate as advertised, nor did the clause interfere with Tesoro's ability to fulfill its obligations. Plaintiffs' breach of contract allegations fail to state a claim because no breach of an express contract provision is alleged.

## V.  Count IV: Implied-In-Fact Contract

Count IV is a repackaging of the illegality claims in count I. Count IV alleges that DESC "knowingly awarded and administered Plaintiffs' contracts

in violation of law and regulation." (Compl. ¶ 79).  This violation rendered "at least the price terms of Plaintiffs' contracts invalid and unenforceable." ( Id. at ¶ 80).  Plaintiffs thus argue that an implied-in-fact agreement was created which required the government to pay at least fair market value for the fuel that it purchased.

Plaintiffs rely on the Federal Circuit's ruling in Barrett, which upheld this court's holding that an illegal EPA clause was replaced with an implied-in-fact promise to pay fair market value.  242 F.3d at 1059-60.  As we explain above, the illegality of the PMM clauses was not at issue before the Federal Circuit.  Id. at 1058.  Based on MAPCO, the PMM clauses had been held to be illegal and the government did not appeal that ruling.  The Federal Circuit only decided the issue of whether it was proper for this court to hold that an implied-in-fact promise to pay fair market value arose on failure of the EPA clause.[20]  Id. at 1059-60.  In the present case, the legality of the PMM clauses was upheld by the Federal Circuit and thus no implied-in-fact term could arise.  See ConocoPhillips, 2006 U.S. Claims Lexis at *22 ("we have no need to resort to an implied-in-fact contract theory when we find no illegality").  Accordingly, Count IV fails to state a claim.

## VI.  Count V: Failure of Consideration and Frustration of Purpose

In count V, plaintiffs allege that part of the consideration upon which they relied in entering the contracts failed for the following reasons: 1) DESC did not award and administer the contracts legally; 2) DESC did not base EPA clauses on adequate price indexes; 3) DESC did not pay at least fair market value; and 4) DESC did not negotiate the contracts in good faith.  Plaintiffs also allege that these actions materially frustrated the purpose of the contracts.

These legal theories, however, are properly considered defenses for non-performance and not a basis for affirmative claims.  See Perpetual Fin. Corp. v. United States, 61 Fed. Cl. 126, 138 (2004) (frustration of purpose, a defense for nonperformance, is not a separate cause of action); Sinclair v. United States, 56 Fed. Cl. 270, 281 n.14 (2003) (granting the government's motion for summary judgment as to plaintiff's claims based upon, among other things, frustration of purpose).  See also First Fed. Sav. & Loan Assoc. of

_____

20.  Also appealed was this court's holding that the government could not assert a counterclaim for any amount it paid in excess of fair market value.  Barret, 242 F.3d at 1058 (the Federal Circuit reversed on that issue and held that the government could assert a valid counterclaim).

Rochester v. United States, 58 Fed. Cl. 139, 159 (2003).  The rules of this court make clear that failure of consideration is an affirmative defense which must be affirmatively pleaded in a responsive pleading.  RCFC 8(c).  See also id. (if a party mistakenly pleads one of these defenses as a counterclaim, the "court on terms, if justice so requires, shall treat the pleading as if there had been proper designation.")  Neither of these theories support a claim for affirmative relief.  Count V fails to state a claim.

## VII.  Count VI: Mistake

Count VI alleges mutual mistake of fact, or, in the alternative unilateral mistake.  The allegations are nearly identical to those in Count II in that the misrepresentations are repackaged in the form of allegations of mistake. Plaintiffs allege that they intended that the contracts: 1) would follow law and regulation; 2) would use indexes that were adequate for the stated purpose of insuring the payment of at least fair market value; 3) would be designed and intended to set or adjust prices; 4) and would ensure that plaintiffs receive at least fair market value for their fuel.  (Compl. ¶¶ 103-106.)  Plaintiffs allege that these were material conditions upon which they relied in entering the contracts.  Plaintiffs then allege that if the government did not knowingly violate all of these conditions, it must be presumed to have intended to use clauses which would have fulfilled all of these conditions.  Plaintiffs allege that if they had known that none of these conditions would be realized, they would not have entered into these contracts.

In the alternative, plaintiffs allege that if DESC was not mistaken, then DESC knew or should have known of plaintiffs' mistake and yet failed to timely disclose such information.  (¶¶ 123-126.)   Plaintiffs cite to Beta Systems, 838 F.2d at 1184-86, for the proposition that the use of an EPA clause that did not "fairly measure the economic situation actually confronting the contractor" supports a claim for mistake.

Defendant counters that the mistakes alleged here did not concern facts that had "come into existence at the time of contracting."  (Def.'s Mot to Dismiss 26.)  See Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990).  Rather, defendant insists that these allegations are, at best, mistakes of judgment concerning events yet to occur.  See Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994).  It argues that no allegation has been made which identifies the indexes as anything besides what they actually are: publications of certain price data. Defendant argues that any unilateral mistake was one of erroneous prediction or judgment on the part of

26

plaintiffs and not the sort of clerical or arithmetical error that is required for a valid claim of unilateral mistake.  It cites <u>United States v. Hamilton Enterprises</u>, 711 F.2d 1038, 1046 (Fed. Cir. 1983) and <u>Dale Ingram, Inc. v. United States</u>, 475 F.2d 1177, 1186 (Fed. Cir. 1983).  Defendant also points out that the alternative test for unilateral mistake is one of unconscionability and that no such facts have been alleged.  <u>See</u> <u>J&E Salvage v. United States</u>, 37 Fed. Cl. 256, 256 (1997).

A claim for a mutual mistake of fact can be established when all four of the following elements are met: "1) the parties to the contract were mistaken in their belief regarding a fact; 2) that mistaken belief constituted a basic assumption underlying the contract; 3) the mistake had a material effect on the bargain; and 4) the contract did not put the risk of the mistake on the party seeking reformation."  <u>Dairyland</u>, 16 F.3d at 1202 (quoting <u>Atlas Corp.</u>, 895 F.2d at 750).  The mistake must concern a fact that existed at the time of contracting.  <u>Atlas Corp.</u>, 895 F.2d at 750.  Therefore, "[a] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a mistake."  <u>Dairyland</u>, 16 F.3d at 1203 (quoting the <u>Restatement (Second) of Contracts</u> § 151 cmt. a).  Nor will a mere mistake of judgment support a claim for relief.  <u>Liebherr Crane Corp. V. United States</u>, 810 F.2d 1153, 115-58 (Fed. Cir. 1987).

As we previously held, <u>supra</u> section I, defendant did not violate any laws or the FAR in its use of the PMM and other market-based indexes.  <u>See</u> <u>Tesoro II</u>, 405 F.3d at 1348.  Consequently, any alleged error arising out of an assumed illegality fails.

Plaintiffs' allegations of a mistaken belief that DESC would use EPA clauses to guarantee the payment of at least fair market value also fail to state a claim.  As this court recently held in a similar case:

> When sophisticated parties chose a mechanism on which to base price adjustments, the parties each assume the risk that the measure will not reflect exactly what they hoped it would.  In this case, each party understood what the PMM measured, and each party was responsible for determining the issues that were important to it with regard to the way in which the indexes worked.  To the extent that the parties did not understand what the PMM measured -- and to the extent that plaintiff thought the PMM would be adequate "to protect against market fluctuations and to ensure that the prices DESC paid for military fuel

[would] reflect[] at least fair market value," that was an error of
judgment . . . or a case of a party treating its limited knowledge
as sufficient . . . as to which the party proceeded at its own risk.

La Gloria Oil, 2006 U.S. Claims LEXIS at *108-109 (internal citations
omitted).

Put another way, whether the selected indexes would result in a price
that reflected fair market value is a question of judgment. Plaintiffs knew how
the pricing clauses would operate. The contract language was unambiguous.
The decision to enter into these contracts in the hope of receiving fair market
value thus required an exercise of judgment on plaintiffs' part. See Glopak,
851 F.2d at 338 (plaintiff could not state a valid claim for undue surprise
because plaintiff was not ignorant of the nature and operation of the EPA
clause; accordingly it was held to be an error of business judgment). Plaintiffs
cannot now complain that "as a result of changes in the Price Index, []
performance of the contract did not work out financially as [they] had
anticipated and hoped it would." Id.

Plaintiffs' allegation concerning the use of indexes not designed to set
or adjust prices also fails to state a claim. Whether the original publishers of
the indexes intended for them to be used by DESC or anyone else to set prices
was not an element of the bargain between DESC and Tesoro. See Dairyland,
16 F.3d at 1202 (the mistake must have a material effect on the bargain). The
parties themselves chose to use the indexes to set or adjust prices. The original
intent of the publishers of the indexes is thus irrelevant as it bears on these
contracts. ConocoPhillips, 2006 U.S. Claims LEXIS at * 26. Both DESC and
Tesoro entered into unambiguous contracts that called for the adjustment of
prices using certain market indexes. There could have been no mistake on the
part of either party as to whether these indexes would be used for such a
purpose.

Our analysis of plaintiffs' allegations concerning mutual mistake is
equally dispositive of the alternative allegations of unilateral mistake. The
mistakes alleged here were mistakes of judgment and not clerical or
arithmetical errors that would support relief. See Hamilton Enterprises, 711
F.2d at 1046. Nor would the allegations of unilateral mistake cause the
contract to be unconscionable. See J&E Salvage, 37 Fed. Cl. at 256 (stating
that the effect of a unilateral mistake must be such that the enforcement of the
contract would be unconscionable). An unconscionable contract is one "which
no man in his senses, not under delusion, would make on the one hand, and

which no fair and honest man would accept on the other . . . ." Hume v. United States, 21 Ct. Cl. 328, 330 (1886). The present contracts hardly meet that test. In Glopak, the Federal Circuit upheld this court's holding that an EPA clause was not unconscionable even when the index involved dropped 18 percent at a time when the plaintiff's actual costs rose five percent. 851 F.2d at 336-338. The court further stated that plaintiff could not claim surprise or lack of consent because it was aware of the nature of the price escalation clause; its inclusion was a matter of business judgment. Id. at 338. The same reasoning applies here. Morever, plaintiffs continued to enter into similar contracts for 17 years. At some point their continued willingness to use these clauses, after watching them operate for years, constitutes a waiver. Such circumstances certainly leave no room for an argument of unconscionability.

Plaintiffs have failed to allege facts sufficient to support a claim of either mutual or unilateral mistake. Accordingly, plaintiffs' allegations in count VI fail to state a claim.

## VIII.  Count VII: Taking

In count VII, plaintiffs allege a fifth amendment taking. They contend that DESC took possession of their fuel and "infringed upon [their] property rights in and in relation to the fuel [they] delivered" without a "supporting claim of right." (Compl. ¶ 131). They allege they have not been paid just compensation as required by the fifth amendment. Defendant counters that this is not a proper claim for a taking, because a contract covered the property at issue.

A takings claim is appropriate when the government acts in its sovereign capacity to either physically take property or effectively render it worthless by regulation or other government action. See Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978). The fifth amendment's takings clause has limited application when the parties' rights have been created by a contract. J.J. Henry Co. v. United States, 411 F.2d 1246, 1249 (Ct. Cl. 1969); See Gratz v. United States, 25 Cl. Ct. 411, 420, aff'd, 985 F.2d 583 (Fed. Cir. 1992). It may be possible for the government to effectively appropriate a contractor's rights under a contract through legislation or some other means and thus effectuate a fifth amendment taking, but that is not what is alleged here. See Omnia Commercial Co. v. United States, 261 U.S. 502 (1923).

Plaintiffs' claim is premised on the illegality of the contracts at issue, not on an infringement of their contract rights nor upon the physical seizure of

their property.  Tesoro admits that if DESC established the validity of the contract it would defeat Tesoro's claims.  (Pl.'s Op. To Def.'s Mot. 50.) <u>See Scan-Tech Security v. United States,</u> 46 Fed. Cl. 326, 341 (2000). Our holding under count I that these contracts were legal is thus fatal to plaintiffs' claim in count VII.

CONCLUSION

Our analysis leads us to the conclusion that the complaint in its entirety must be dismissed.  The court therefore grants defendant's motion to dismiss under RCFC 12(b)(6) as to counts I-VII, except for paragraphs 45 and 46. Paragraphs 45 and 46 are dismissed for lack of jurisdiction under RCFC 12(b)(1).  Additionally, because plaintiffs have failed to plead facts upon which this court can grant relief, their RCFC 56(f) Motion for a Continuance to Permit Discovery is denied. "Where a case is resolved on a motion to dismiss, additional discovery will not save it."  <u>La Gloria</u>, 2006 U.S. Claims LEXIS at *120.  Defendant's motion to stay proceedings is denied as moot. The Clerk is directed to dismiss the Second Amended Complaint and enter judgment for defendant.  No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

30